**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

BRIAN ALFORD,

                Petitioner,

    v.

DWIGHT NEVEN, et al.,

                Respondents.

Case No. 2:14-cv-00333-APG-NJK

**ORDER**

Petitioner Brian Alford's counseled, second-amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the court for final disposition on the merits (ECF No. 29).

**I.    Procedural History and Background**

On January 16, 2009, a jury found petitioner guilty of first-degree murder. Exh. 38.[1] Alford entered into a stipulation with the State to waive the jury for the sentencing phase. Exh. 40. On March 6, 2009, the state district court sentenced Alford to life with the possibility of parole after 20 years, with a consecutive term of 43 to 192 months for the deadly weapon enhancement, and judgment of conviction was entered. Exhs. 41, 42.

The Nevada Supreme Court affirmed Alford's conviction on July 22, 2010, and remittitur issued on August 16, 2010. Exhs. 54, 56.

---

[1] Exhibits referenced in this order are exhibits to the first-amended petition, ECF No. 13, and are found at ECF Nos. 8-12.

Alford filed a state postconviction petition for writ of habeas corpus, and the state district court appointed counsel.  Exhs. 58, 59, 60.  The state district court granted the State's motion to dismiss the petition on the basis that all claims either were or could have been raised on direct appeal or failed to plead sufficient claims for ineffective assistance of counsel. Exh. 64.  The Nevada Supreme Court affirmed the dismissal of the petition on December 17, 2013, and remittitur issued on January 13, 2014.  Exhs. 73, 74.

Alford dispatched his federal habeas petition for mailing on February 27, 2014 (ECF No. 4).  This court granted petitioner's motion for appointment of counsel; Alford filed a counseled, first-amended petition on June 2, 2014 (ECF No. 13).  In response to respondents' motion to dismiss (ECF No. 16), Alford filed a motion for leave to file a second-amended petition (ECF No. 21).  Respondents indicated that they did not oppose the filing of a second-amended petition (ECF No. 27).  This court granted leave to file the second-amended petition (ECF No. 27).  Alford filed the second-amended petition, and respondents answered (ECF Nos. 29, 35).

II.   **Legal Standard -- AEDPA**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

III.    **Instant Petition**

The court considers the grounds out of numerical order, addressing ground 4 first.

**Ground 4**

Alford argues that insufficient evidence was presented by which a jury could have convicted him of first-degree murder (ECF No. 29, pp. 17-19).  He contends that the prosecution failed to present sufficient evidence of willfulness, deliberation, and premeditation.  With respect to the State's felony-murder theory, Alford asserts that the prosecution failed to present sufficient evidence of burglary or robbery.  He also claims that the trial court's error in failing to clear up the jury's confusion with respect to the elements of burglary contributed to the erroneous verdict.  *Id.*

"The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 309 (1979) (citing *In re Winship*, 397 U.S. 358 (1970)). On federal habeas corpus review of a judgment of conviction pursuant to 28 U.S.C. § 2254, the petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. On habeas review, this court must assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and must defer to such resolution. *Id.* at 326. Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence. *Schlup v. Delo*, 513 U.S. 298, 330 (1995).

The trial witnesses testified similarly as to the events leading up to the shooting. Melissa (Missy) Simcoe, Loren Dudley, Shanika Thompson and Brandon Alford were out drinking, taking ecstasy and going to various clubs and bars on the night in question. *See, e.g.*, exh. 32, pp. 791-832, 837-868. Thompson became very intoxicated and "out of it," and they took her to Simcoe's house. Thompson's boyfriend Jasper Jackson arrived, was angry about Thompson's condition, took her with him and left. Thereafter, Jackson started calling Simcoe on her cell phone, angry and threatening her. Jackson had taken Thompson to the home of Thompson's brother, Jerome Castro. Simcoe's children had also been left at Castro's earlier while the group went out that night. Brandon called his twin brother Brian to meet up with him. Due to Jackson's threatening calls the brothers stopped at their house and each got a gun, then ultimately the brothers and Simcoe drove to Castro's home. Dudley was already there; Jackson was not there. *Id.*, *see also* exh. 32, pp. 714-777, 780-83.

The defendant Brian Alford testified as follows: when he went over to Castro's house, he thought that Jackson would be there; he did not know that Castro and Dudley

would be there.   Exh. 32, pp. 791-832, 837-868.  Brian testified that Castro was upset about his sister's condition, blamed Brandon, and twice approached Brandon aggressively.  Brian intervened and said that if they were going to fight, they should all go outside.  *Id.* at 816.  The Alford brothers went outside, and the door was shut behind them.  They heard yelling and references to someone wielding a knife inside.  The door opened, Castro and Simcoe and her children were in the doorway.  Brian grabbed Simcoe and pulled her out of the house; he also pulled her older son out.  As he bent to pick up her infant in a car seat, someone said to Brian "don't let me catch you downtown."  *Id.* at 822.  In response, Brian spit on Castro.  Castro rushed at Brian, swinging.  They fought, and Brian pushed Castro back into the house.  Brandon and Dudley also began fighting each other inside the house.   Castro went down, Brian realized his gun had fallen out of his clothing, and he saw Castro reach for it.  Brian kicked the gun away from Castro.  Brian picked up the gun and began striking Castro on the sides of the head with it.  The gun went off accidently, surprising Brian.  He thought he might have shot himself in the leg, then thought he might have shot Brandon in the back.  He checked and saw that he hadn't shot Brandon; then he patted down Castro and Dudley for weapons.  He did not see blood on Castro and did not think he'd shot Castro.  He and Brandon backed out of the house.  Brian drove home, and when he walked into the house he saw a "big hole" in his leg and thought he had shot himself. *Id.* at 831.

On cross examination Brian stated that after Castro was down Brian continued striking him, hard, on both sides of the head, and he believed that he had broken Castro's jaw and/or given him a concussion.  Brian testified that he could not recall if Castro was in a defensive posture.  He stated that when neither Castro nor Dudley was moving, even though they no longer posed a threat, he patted them both down for weapons and kicked Castro again in the ribs before leaving with his brother.  *Id.* at 861.

6

On redirect Brian testified that when he left he saw no blood, he thought Castro was alive and did not think Castro had been shot. *Id.* at 867.

Detective David Philip Jenkins testified for the State that police obtained search warrants for the Alford brothers' home, they were arrested there after the incident, and the guns were found. Exh. 30, pp. 401-430, 436-437-457. Jenkins stated that when Brian was arrested, he mentioned having shot someone and referred to it as an accident. *Id.* at 413.

Once Brian had been arrested, he asked to speak to his girlfriend, Tarina Weatherhead. At the police station, Jenkins allowed Weatherhead and Brian Alford to speak in an interview room and videotaped the conversation. The videotape was admitted at trial, and Jenkins also testified about Alford and Weatherhead's exchange. Exh. 30, pp. 417-422. Weatherhead suggested to Alford that what had happened must have been an accident or self defense. Alford replied that it is not self defense when you're beating a man with a gun or beating someone. Alford said a second time that it was not self defense. Alford told Weatherhead that Castro was arguing with the Alford brothers inside the house. They were all going to take their disagreement outside. When the Alford brothers stepped outside, Castro locked the door behind them. Alford heard a commotion inside, he yelled for Simcoe to come out with her children. The front door eventually opened, an infant car seat was passed outside to Alford, then Castro spit in Alford's face. Alford swung at Castro, then pushed him through the door into the house. They were trading blows, the gun Alford had fell out of his clothing on to the floor, Castro reached for the gun, but Alford picked up the gun. Alford then was striking Castro about the head and face with sweeping motions to the left and right; Castro was on his back with his hands raised in a defensive posture. As Alford was beating Castro, the gun discharged. Alford told Weatherhead that he thought he might have broken Castro's jaw or given him a concussion at the worst. He said it was not self defense and he would have to pay for what he had done, he said he thought it might be

manslaughter, then a second time, a short time later, he said "I hope it would be manslaughter." Jenkins let the pair talk in the interview room for about thirty-five to forty minutes. *Id.*

Thereafter, Weatherhead was removed from the interview room, and Jenkins and another detective sat down to interview Alford. Jenkins stated that they read Alford his *Miranda* rights at that time. Alford told the detectives that when Simcoe was handing her infant in the car seat out the door to Alford, Alford saw Castro and spat in Castro's face. *Id.* at 429. In response, Castro began swinging at Alford. Alford pushed Castro inside and against a wall; Alford described the altercation as a "hockey fight." He said the gun fell to the ground, Castro reached for it, Alford grabbed the gun by its grip and began beating Castro about the face and head area. Castro fell down to the ground on his back with his hands up in a defensive posture. The gun discharged, which caught Alford very much by surprise. He initially thought the shot had come from Brandon and Dudley. He stated that Castro and Dudley were then unconscious or semi-conscious and he decided at that point that he would search them to see if they had anything worth taking. He said he searched them but didn't find anything.

Jenkins testified that he went to check the recording device and realized that only part of his interview with Alford had been recorded. He began recording again, and tried to get Alford to adopt or summarize what he had already told them, which Alford did.

On cross examination, Jenkins testified that Alford did not talk about searching either of the men in the recorded portion of the interview. *Id.* at 442. He confirmed that Alford did not say anything about searching anyone to Weatherhead and that the only time Alford referenced it was the portion of the interview that was not recorded due to malfunction. He also agreed that about $350 was recovered from Castro's pocket. *Id.* at 445.

8

Jenkins testified that that he recorded Weatherhead and Alford's conversation pursuant to policy and procedure that the unsupervised activities of an inmate in custody are to be monitored. He also acknowledged that there was potentially investigative value to listening to the conversation. *Id.* at 449. Jenkins said that he did not tell Weatherhead or Alford that their conversation would be secret, "in fact, just the opposite." *Id.* at 449-450. On re-direct, Jenkins testified that he took notes contemporaneously with the entire interview (including the portion that was not recorded) and that he had made note that Alford said he searched Castro and Dudley. *Id.* at 454.

Crystal Hall, Castro's roommate, testified as follows: she was home sleeping that night because she had to work the next day, and the commotion when the Alfords arrived woke her. Exh. 29, pp. 144-230. She testified that as Missy Simcoe was leaving the residence with her kids, Brian, standing on the porch, said to Castro "we'll find you on the streets," then spit in Castro's face. *Id.* at 172. She stated that Alford threw the first punch and pushed back through the doorway into the home. Brian pulled out a gun and raised it up over Castro's head. It looked to her like Brian had his finger on the trigger. She never saw any struggle between the two for the gun; she never saw the gun on the floor and never saw either man bend over to the floor. Once she saw the gun, she grabbed the two children who were present and went with another woman into a back bedroom. She started to dial 911 when she heard one gunshot. Shanika Thompson was in the room where the men had been fighting and started screaming and somebody swore at her and told her to shut up "or we're going to shoot you next." *Id.* at 178. While Hall was on the phone with the 911 operator, she went back out to the living room where she saw Castro lying face down, saw blood and observed that Castro was breathing very hard, as if he were snoring.

On cross examination, Hall testified that the wound on Castro's head looked as if the bullet had "skimmed off." *Id.* at 196. When pressed by defense counsel, she reiterated

9

that it was Brian Alford who spit in Castro's face, Castro continued to try to shut the door, and then Brian threw the first punch. *Id.* at 214-215. She stated that she did not see Brian draw the gun, she just saw the gun in his hand. On redirect Hall testified that she was certain the gun was never on the floor. *Id.* at 226-227.

Loren Dudley, who was at Castro's home with him when the Alford brothers arrived, testified as follows. Exh. 30, pp. 243-321. He testified as Hall did that after Missy and her children went out the door, Castro was closing the door, and then Brian appeared in the doorway, spit in Castro's face, and threw the first punch. *Id.* at 262-263. Dudley began fighting with Brandon Alford. At some point he heard someone say "you're not so tough now," then he heard a gunshot and saw a muzzle flash. *Id.* at 264. Then Brandon was hitting Dudley on the side of the head with something, which turned out to be a pistol. Dudley was losing consciousness; he could see the Alford brothers go through Castro's pockets, then they came over and went through Dudley's pockets. Dudley could not recall whether they patted the outside of his clothing or reached into his pockets. On cross examination, defense counsel showed Dudley a transcript from a hearing about two months after the incident in which Dudley testified that it was Castro who threw the first punch.

Brandon Alford testified to the following: he and Brian were out on the porch waiting for Simcoe, the door opened up, Simcoe came out, Castro came out, and threw the first punch at Brian. Exh. 32, pp. 714-777, 780-83. Brandon started fighting with Loren Dudley. A gun went off; Brandon did not know who was shooting or what was going on, and he kept fighting Dudley. He turned around and saw Brian hit Castro with the gun. Brandon picked up his own gun and struck Dudley with it. He testified that neither he nor Brian went through either of the other two men's pockets. He stated that he saw Brian pat down both men to see if they had any weapons. *Id.* at 748.

Neurosurgeon Dr. Michael H. Song testified that he performed emergency surgery on Castro when he was brought to the hospital. Exh. 31, pp. 531-542. Song testified

that Castro had a bullet that went underneath his scalp and did not penetrate his skull, but because of the trauma from the bullet hitting the skull, Castro suffered a severe closed head injury.  Though in Song's opinion it was unlikely to be successful, he operated to try to relieve brain swelling.  He completed the operation, left the operating room, and was immediately called back because Castro's heart had stopped.  Song stated that the cause of death was massive brain swelling from the gunshot wound.  *Id.*

Dr. Ellen Clark, a forensic pathologist and Chief Medical Examiner for Washoe County, testified.  Exh. 31, pp. 614-639.  She stated that she performed the autopsy on Castro, and in her opinion the cause of death was gunshot wounds to the head and arm and the manner of death was homicide.  *Id.* at 620.  The bullet passed through Castro's arm and hit his head.  *Id.*

In ground 4, Alford argues that the prosecution failed to present sufficient evidence of willfulness, deliberation, and premeditation.  Alford also asserts that the prosecution failed to present sufficient evidence of burglary or robbery to support felony murder.  Further, he claims that the trial court's error in failing to clear up the jury's confusion with respect to the elements of burglary contributed to the erroneous verdict (ECF No. 29, pp. 17-19).

Affirming the conviction, the Nevada Supreme Court reasoned:

> "where there is conflicting testimony presented, it is for the jury to determine what weight and credibility to give to the testimony."  *Bolden v. State*, 624 P.2d 20, 20 (Nev. 1981) [internal quotations and citations omitted].  Additionally, an entry into a dwelling with the intent to commit battery may support a felony-murder charge.  *State v. Contreras*, 46 P.3d 661, 664 (Nev. 2002).
>
> We conclude that there was sufficient evidence presented to support Alford's conviction for first-degree murder with the use of a deadly weapon.  There was evidence presented to the jury that as Castro attempted to shut his front door on Alford, Alford spit on Castro and prevented Castro from shutting the door by pushing the door in.  Additionally, evidence was presented that Alford started the fight that ultimately led to Castro's death.  While Alford did present his theory of the case that the fight started on Castro's front porch and then moved inside during the mutual combat, the jury determined that the State's evidence

11

was more credible.  As such, we cannot say that any rational trier of fact could not have found Alford guilty on the facts presented at trial.  Thus, we conclude Alford's argument is without merit.

Exh. 54, pp. 6-7.

Alford has failed to demonstrate that the Nevada Supreme Court's conclusion was contrary to or an unreasonable application of federal law.  He has not shown that the evidence was insufficient to support intentional and premeditated murder or felony murder with burglary as the underlying felony.  Evidence was presented at trial that, after being locked out of Castro's house, Brian spit on Castro, then punched and pushed Castro back into the house with the intent to batter Castro.  With respect to intentional and premeditated murder, evidence was presented that Brian stopped at home and got a gun, fought with Castro, and—especially according to Crystal Hall – pulled his pistol, pointed it toward Castro and fired a shot.

With respect to felony murder, the relevant portion of NRS 205.060(1) prescribed at that time that a person who enters any house with the intent to assault or batter any person is guilty of burglary.  As the Nevada Supreme Court noted, Alford's defense theory was that he and Castro were engaged in "mutual combat" that began on the porch and moved inside and that such a mutual fight does not comport with the definition of burglary.  Nevertheless, evidence was presented that Brian pushed Castro into the house.  Alford also complains that the district court mishandled a jury question.  A juror asked 'if in the course of the fighting on the porch and the threshold of the house the fight moves into the house, is this burglary?  More specifically on the part of the defendant, even if both parties are committing assault?"  Exh. 34.  The judge referred the jury to the jury instruction that set forth the elements of burglary.  Exh. 37, jury instruction no. 28.  The instruction provides that entry must be made with the intent to commit assault or battery, even if entry is made with the consent of the owner.  The instruction then defines assault and battery.  *Id.*  Alford does not even argue that the instruction incorrectly defines burglary under Nevada law.

Alford has failed to demonstrate that the Nevada Supreme Court's decision with respect to federal ground 4 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 4.

**Grounds 3 & 5**

Alford argues that the trial court abused its discretion throughout trial by allowing the case to proceed on insufficient evidence and allowing inadmissible evidence at trial (ECF No. 29, pp. 20-21).

As ground 5(A), Alford contends that the trial court violated Alford's due process rights by admitting the secretly-recorded conversation between Alford and his girlfriend, which was illegally obtained and prejudicial. He claims that police did not advise him that he was being recorded, nor did they advise him that police were using Weatherhead as an agent of the State. *Id.*

Relatedly, Alford claims in ground 3 that the trial court improperly admitted Detective Jenkins' testimony regarding the videotaped conversation between Alford and his girlfriend, Tarina Weatherhead, in violation of Alford's Fifth and Fourteenth Amendment due process rights (ECF No. 29, p. 17). He asserts that it was cumulative of the videotaped conversation that was played for the jury.

The Nevada Supreme Court rejected these claims:

> Alford argues that the district court abused its discretion in admitting into evidence a conversation, videotaped by Detective David Jenkins, between Alford and Weatherhead at the police station following his arrest. Alford further contends that Weatherhead was used as an agent of the police and he was interrogated while in custody without having been informed of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). We disagree because Alford failed to file a motion to suppress this evidence or object to its admission at trial.

> "[T]his court may review plain error or issues of constitutional dimension *sua sponte* despite a party's failure to raise an issue below." *Murray v. State*, 930 P.2d 121, 124 (1997). "[P]lain error is error which

13

either had a prejudicial impact on the verdict when viewed in context of the trial as a whole or seriously affects the integrity or public reputation of the judicial proceedings." *Parodi v. Washoe Medical Center, Inc.*, 892 P.2d 588, 590 (Nev. 1995) [internal quotations and citations omitted].

NRS 174.125(1) addresses the filing of a motion to suppress and states:

All motions in a criminal prosecution to suppress evidence, for a transcript of former proceedings, for a preliminary hearing, for severance of joint defendants, for withdrawal of counsel, and all other motions which by their nature, if granted, delay or postpone the time of trial must be made before trial, unless the opportunity to make such a motion before trial did not exist or the moving party was not aware of the grounds for the motion before trial.

We have held that a civilian may be deemed a police agent when that civilian makes an express agreement with the police to speak to a suspect who is then in custody. *Boehm v. State*, 944 P.2d 269, 271 (Nev. 1997).

We conclude that all of Alford's arguments are without merit because he failed to file a motion to suppress or object to the admission of the evidence at issue. Specifically, since Alford failed to file a motion to suppress the videotaped conversation, there is no order from the district ruling on the admissibility of the interview for this court to review. Further, Alford has show no evidence that Weatherhead made an agreement with Detective Jenkins to elicit statements from Alford during the conversation, thus failing to show that Weatherhead should be seen as an agent of the police. Additionally, Alford failed to make any argument which shows that the district court committed plain error, failed to show that the admission of this evidence had a prejudicial impact on the verdict when viewed in context of the trial as a whole, or seriously affected the integrity or public reputation of the judicial proceedings. As such, we conclude that the district court did not abuse its discretion in admitting the videotaped conversation between Alford and Weatherhead.

Exh. 54, pp. 10-12.

This claim is bare and conclusory; Alford points to no evidence to support his contention that Weatherhead had any agreement with the State. In fact, Detective Jenkins testified that after he was arrested Alford repeatedly asked to speak to Weatherhead. When Jenkins was asked if he told Alford his conversation with his girlfriend in the police station interview room would be confidential, Jenkins testified that he did not say that and followed up with: "in fact, just the opposite." Exh. 30, pp. 449-

14

450.  There is no evidence that Weatherhead was in any way "interrogating" Jenkins as an agent of the state.  Therefore, Alford's rights under *Miranda*, which applies to custodial interrogations, were not even implicated.  Grounds 3 and 5(A) are meritless.

In ground 5(B), Alford claims that the trial court improperly limited defense counsel's cross-examination of Loren Dudley and Brandon Alford (ECF No. 29, p. 21).  He states that the trial court refused to permit questions about the fact that Brandon was convicted of battery with a deadly weapon, not robbery or burglary.  He also stated that the court did not allow defense counsel to impeach Dudley with evidence of his prior probation violation.

The Nevada Supreme Court denied this claim on direct appeal:

> Alford argues that the district court improperly curtailed cross-examination of key witnesses, thereby depriving him of his Sixth Amendment right to confrontation.  Alford contends that the district court erred in not allowing him to cross-examine Brandon about the facts underlying Brandon's felony conviction for battery with a deadly weapon for his role in the fight between Brandon and Dudley.  Alford further contends that the district court erred in failing to allow him to impeach Dudley with a probation violation from a 2006 burglary conviction.  We disagree.

> "Determinations of whether a limitation on cross-examination infringes upon the constitutional right of confrontation are reviewed *de novo*."  *Mendoza v. State*, 130 P.3d 176, 182 (Nev. 2006).

> "The Sixth Amendment's Confrontation Clause provides: In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.  This right is secured for defendants in state as well as in federal criminal proceedings."  *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987) [internal quotations or citations omitted].  "The Court has emphasized that a primary interest secured by the [Confrontation Clause] is the right of cross-examination."  *Id.*  An "accused [has the right] to require the prosecution's case to survive the crucible of meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656 (1984).

> We conclude that Alford's argument is without merit because he has failed to show that he was entitled to cross-examine either Brandon or Dudley on the specific issues complained of.  Alford has failed to cite to any caselaw that supports his proposition that the jury had a right to hear the underlying facts regarding Brandon being found guilty of battery with a deadly weapon.  Further, evidence of Dudley's parole violation, which was

15

in no way relevant to Alford's trial, would only have been introduced to show Dudley's general bad character.  This type of character evidence is not admissible under NRS 48.045.  As such we conclude that the district court did not improperly curtail Alford's ability to cross-examine Brandon or Dudley.

Exh. 54, pp. 16-18.

Alford argues that his Sixth Amendment rights were violated because defense counsel could not elicit from Brandon the fact that based on the events at issue he entered into a guilty plea agreement for battery with a deadly weapon.  This court notes that the defense called Brandon as a witness, and it is unclear that the Sixth Amendment right to confront witnesses against the defendant is implicated at all.  Moreover, Alford points to no clearly established U.S. Supreme Court law that holds that he had a specific right to question Brandon as to the guilty plea agreement.  Moreover, Alford certainly has not shown that the state court's evidentiary determination that evidence of Dudley's parole violation was entirely irrelevant and would only be introduced to show general bad character was incorrect or ran afoul of Alford's federal constitutional rights.

Alford has failed to demonstrate that the Nevada Supreme Court decision with respect to ground 3 and either part of ground 5 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Accordingly, grounds 3 and 5 are denied.

**Ground 2**

Alford asserts that the trial court used improper jury instructions in violation of his Fifth and Fourteenth Amendment due process rights (ECF No. 29, pp. 14-16).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted

or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502 U.S. at 72.

In ground 2(A) Alford argues that the jury instructions regarding the felony murder rule improperly reduced the State's burden (ECF No. 29, p. 15). Jury instruction 26 provided the following:

> Whenever death occurs during the perpetration or attempted perpetration of certain felonies, which are: sexual assault, kidnapping, arson, robbery, burglary, invasion of the home, sexual abuse of a child, sexual molestation of a child under the age of 14 years, child abuse, or abuse of an older person, the killing constitutes MURDER IN THE FIRST DEGREE. This is the felony murder rule.
>
> In regard to the felony murder alternative, the State is not required to prove that the killing was committed with malice, premeditation, or deliberation. An unlawful killing of a human being, whether intentional, unintentional, or accidental, which is committed in the perpetration or attempted perpetration of the felonies listed above is first degree murder.
>
> Therefore, the elements of FELONY MURDER OF THE FIRST DEGREE, as alleged in this case are:

1) The defendant did willfully and unlawfully;

2) Perpetrate or attempt to perpetrate the felony crime of burglary; and

3) The killing occurred during the perpetration or attempted perpetration of the burglary.

Exh. 37, p. 29.

Jury instruction no. 28 prescribed the elements of burglary:

(1) The defendant entered any house, room, apartment, or other building structure;

(2) With the intent to commit assault or battery on any person, or larceny, or any felony therein.

> Exh. 37, p. 31. That instruction also defined the terms assault and battery. *Id*.

The justice court had found that the prosecution had failed to submit sufficient evidence to bind over a burglary charge to the district court. Alford argues that insufficient evidence of burglary was presented at trial. He contends that because the jury instructions contained the elements of burglary as well as robbery, the State's burden to prove a valid underlying felony in order to present a viable theory of felony murder was reduced (ECF No. 29, p. 15).

Rejecting this claim on direct appeal, the Nevada Supreme Court explained:

> "Pursuant to NRS 200.030, the commission of a felony and premeditation are merely alternative means of establishing the single *mens rea* element of first degree murder, rather than constituting independent elements of the crime." *Holmes v. State*, 972 P.2d 337, 341 (Nev. 1998). In *Holmes*, we held that: ". . . . Although the justice court had dismissed the felony robbery charge due to insufficient evidence, the State was not precluded from advancing the theory at trial that [the defendant] had murdered [the victim] during the commission of a robbery." *Id.* at 342.
>
> We conclude that Alford's argument is without merit because we, along with other jurisdictions, have continued to hold that the underlying felony need not be proved or even be pleaded to sustain a prosecution for felony murder. *See id.* (stating that "[c]onsistent with our approach, many jurisdictions have held that the State may seek a conviction for murder based on a theory of felony-murder without even charging the underlying predicate felony.") As such, we conclude that the district court did not abuse its discretion in instructing the jury to utilize the burglary allegation against Alford to substantiate malice for the purpose of a first-degree murder charge.

Exh. 54, p. 8.

In addressing ground 4, above, the court discussed how Alford has not demonstrated that the State presented insufficient evidence of burglary. Alford has not shown that the jury instructions on the felony-murder rule were erroneous, much less that that either "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72.

Next, Alford contends in ground 2(B) that the trial court erred because it failed to instruct the jury that the State was required to show, beyond a reasonable doubt, that Alford did not act in the heat of passion (ECF No. 29, p. 16).

The Nevada Supreme Court rejected the claim:

> Alford argues that the district court abused its discretion in instructing the jury on the State's burden of proof to prove beyond a reasonable doubt that he did not act in the heat of passion with the requisite legal provocation. We disagree.
>
> We have held that "the district court may refuse a jury instruction on the defendant's theory of the case which is substantially covered by other instructions." *Runion v. State*, 13 P.3d 52, 58 (Nev. 2000). Further, "[a] jury is presumed to follow its instructions." *Leonard v. State*, 17 P.3d 397, 405 (Nev. 2001) [internal quotations and citations omitted].
>
> We conclude that Alford's argument is without merit because the jury was properly instructed on the State's burden of proof. Additionally, since Alford did not object to the instructions given by the district court, and did not provide the district court with a proposed jury instruction on manslaughter, it is inappropriate for him now to complain that the district court erred in failing to give such an instruction. As such, we conclude that the district court did not abuse its discretion in instructing the jury concerning manslaughter.

Exh. 54, p. 9.

Alford has not carried his burden of showing that the state supreme court's decision was arbitrary, unreasonable, or contrary to federal law. He has not shown that his due process rights were violated when the trial court did not instruct the jury that the State was required to show, beyond a reasonable doubt, that Alford did not act in the heat of passion. Alford's theory of defense was that the gun accidently discharged. But the State did not rely solely on a theory of premeditation and deliberation. The State argued alternatively that Alford was guilty of first-degree murder under the felony-murder rule because the killing occurred during the commission of a burglary.

In ground 2(C) Alford asserts that the trial court failed to properly address a jury question, allowing the jury to find Alford guilty of felony murder based on the invalid burglary predicate theory (ECF No. 29, p. 16). Again, as discussed above with respect

19

to ground 4, a juror submitted a question to the court: "if in the course of the fighting on the porch and the threshold of the house the fight moves into the house, is this burglary?  More specifically on the part of the defendant, even if both parties are committing assault?"  Exh. 34.  In response, the court referred the jury to the jury instruction that stated the elements of burglary.  Exh. 37, jury instruction no. 28 (set forth above).  And again, Alford does not even argue that the instruction incorrectly defines burglary under Nevada law.  Further, while Alford's theory was that of "ongoing mutual combat that spill[ed] into a residence," evidence was also presented that would support a conclusion that Alford entered the residence with the intent to assault or batter Castro.

Alford has failed to demonstrate that the Nevada Supreme Court decision with respect to any part of federal ground 2 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Federal habeas relief is, therefore, denied as to ground 2.

**Ground 1**

Alford contends that his trial counsel rendered ineffective assistance in violation of his Sixth Amendment rights (ECF No. 29, pp. 11-14).  Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)). The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal

citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

In the first part of ground 1, Alford alleges that trial counsel failed to conduct sufficient pretrial investigation to discover that Detective Jenkins had secretly recorded a conversation between Alford and his girlfriend, failed to file a motion to suppress the contents of the taped conversation, and failed to object to Detective Jenkins' testimony regarding the conversation (ECF No. 29, pp. 11-14).

Affirming the dismissal of this claim, the Nevada Supreme Court pointed out that Alford failed to provide it with the trial transcripts. The state supreme court concluded that Alford failed to demonstrate how a pretrial interview with Detective Jenkins would

have altered the trial testimony or the outcome of the trial.  Exh. 73, p. 2.  That court

continued:

> [Alford] argues that trial counsel was ineffective for failing to file a
> motion to suppress, or make an objection to the admission of, the
> recorded conversation between appellant and his girlfriend.  Appellant
> argues that Detective Jenkins secretly recorded the conversation without
> first informing him of his constitutional rights under *Miranda v. Arizona*,
> 384 U.S. 436 (1966).  Appellant fails to demonstrate deficiency or
> prejudice as he fails to show that a motion to suppress would have been
> successful.

*Id.* at 2-3.

The state district court dismissed this claim in Alford's state postconviction petition,

finding that Alford failed to demonstrate prejudice or any likelihood that a motion to

suppress would have been granted.  The court noted *Miranda* governs custodial

interrogations and that, to determine whether a custodial interrogation without proper

prior *Miranda* warnings occurred, the court examines whether the suspect was (1) in

custody, (2) being questioned by an agent of the police, and (3) subject to

"'interrogation.'" Exh.  64, p. 7 (quoting *Boehm v. State*, 944 P.2d 269, 271 (Nev. 1997)).

The court continued:

> Here, unlike the cases where the Nevada Supreme Court has found a
> violation of *Miranda* and the Nevada Constitution, there is no evidence or
> specific allegation to warrant a conclusion that Weatherhead was acting
> as an agent of the police.  To the contrary, the evidence adduced at trial
> indicates that Weatherhead was acting on her own, not at the behest of
> the police, and that petitioner and Weatherhead entered into a totally
> voluntary conversation.  Nothing indicates that Weatherhead had any
> agreement to act on behalf of or cooperate with the police.  The failure to
> file [a motion to suppress] did not prejudice petitioner.

*Id.*

Alford now argues that if the videotaped conversation—in which he denies having

acted in self defense—and Jenkins' testimony about the conversation had not been

admitted, it is reasonably probable that the jury would have "come to a different

conclusion regarding Alford's level of criminal conduct" (ECF No. 29, p. 12).  This

assertion is belied by the testimony of the witnesses.  Moreover, as no evidence

23

supported the contention that Weatherhead acted as an agent for the State, Alford cannot demonstrate that a motion to suppress had any likelihood of success. Alford has failed to demonstrate prejudice.

As the second part of ground 1, Alford contends that his trial counsel was ineffective for failing to object to jury instructions or submit proper jury instructions on the murder charge (ECF No. 29, p. 14). He argues that defense counsel should have proffered an instruction stating that it is the State's burden to prove beyond a reasonable doubt that the defendant was not acting in the heat of passion or operating under other legal provocation.

The Nevada Supreme Court stated that Alford failed to provide it with trial transcripts or jury instructions for its review and failed to demonstrate that the district court erred in dismissing this claim. Exh. 73, p. 3.

The state district court stated that Alford "fail[ed] to articulate how either of these actions by his trial counsel would have affected the potential outcome of the verdict." Exh. 64, p. 7.

Alford's claim that the court erred in not giving such instruction was denied above. He has not demonstrated that had his trial counsel submitted the instruction there was a reasonable probability of a different verdict. His own testimony was that the gun went off accidently, not that he acted in the heat of passion or in response to legal provocation. Alford has failed to demonstrate that the Nevada Supreme Court's decision affirming the dismissal of the claims in federal ground 1 is contrary to, or involves an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court accordingly denies ground 1.

Therefore, the petition is denied in its entirety.

## IV. Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Alford's petition, the court finds that none of those rulings meets the *Slack* standard. The court therefore declines to issue a certificate of appealability for its resolution of any of Alford's claims.

## V. Conclusion

**IT IS THEREFORE ORDERED** that the second-amended petition (ECF No. 29) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED: 5 June 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE